UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LANCELOT INVESTORS FUND. L.P., et al. | ) | Case No. 08 B 28225 |
| | ) | |
| Debtors. | ) | Judge Jacqueline P. Cox |
| | ) | |
| | ) | |
| RONALD R. PETERSON, not individually but solely as Chapter 7 Trustee for Lancelot Investors Fund, L.P. | ) ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. No. 10-2039 |
| | ) | |
| NAUTICAL NOMINEES LTD, and RITCHIE STRUCTURED MULTI-MANAGER, LTD. | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON MOTION TO DISMISS [Dkt No. 38]**

This matter is before the Court on the Motion of Defendant Ritchie Structured Multi-Manager, Ltd. ("Ritchie") to Dismiss the Amended Complaint ("Complaint") filed by Ronald R. Peterson as Trustee ("Trustee") for Lancelot Investors Fund, Ltd. ("Lancelot Ltd" and together with the other hedge fund debtors, the "Debtors" or the "Funds"). The Complaint asserts constructive fraud claims under the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("Illinois UFTA") that seek to avoid payments Lancelot Ltd. made to redeem its shares in Lancelot Ltd. For the reasons that follow, the Motion to Dismiss is DENIED.

1

I.  JURISDICTION AND VENUE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). Venue is proper pursuant to 28 U.S.C. § 1409(a).

II.  FACTS AND BACKGROUND

Ronald R. Peterson, not individually, but as the Chapter 7 Trustee for the estate of Lancelot Investors Fund, L.P *et. al.* filed this adversary proceeding against Ritchie Structured Multi-Manager Ltd ("the Defendant") and Nautical Nominees Ltd. (together the "Defendants"), on behalf of the hedge fund debtor Lancelot Ltd. to avoid $15,383,198.73 in pre-petition transfers ("Transfers") made by Lancelot Ltd. to Defendants.

The Complaint alleges the following facts, which the Court takes as true as required when ruling on a motion to dismiss.

The Debtors are 19 related entities engaged in the operation of hedge funds and special purpose vehicles. As of October 20, 2008 ("Petition Date"), the date on which the Debtors filed for relief under Chapter 7 of the Bankruptcy Code, the Debtors collectively held assets as listed on their books and records as approximately $1.8 billion. Those assets were comprised predominately of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters ("Petters") and Petters Company, Inc. ("PCI"). The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain affiliated vendors, Enchanted Family Buying Company ("Enchanted") or

Nationwide International Resources ("NIR") and/or certain receivables purportedly due from major retain chains.

The investors in the Funds included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds. At all times Lancelot Ltd.'s investors held claims against it based on contractual rights to redemption, and negligence claims relating to Bell's failure to exercise reasonable care regarding Petters' operations.

**The Petters Scheme**

Beginning in 1995, Petters and certain of the Petters Entities began raising money by offering and selling Notes. Petters sold the Notes to various feeder funds, which, in turn, raised investment capital from hundreds of private investors. The Notes were issued by Thousand Lakes to finance the purchase of consumer electronics and other goods by major retailers such as Costco, Sam's Club, Boscov's, and B.J's (the "Retailers"). It was later discovered that the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators.

In offering and selling Notes, Petters represented to potential investors that the proceeds from the sale of the Notes would be used to finance "purchase order financing" transactions. Purchase order financing allows manufacturers or vendors of goods to obtain immediate payment for goods that have been pre-sold to creditworthy retailers. Under Petters' version of purchase order financing, the Petters Entities arranged for the sale and delivery of end runs or overstocked consumer electronics from manufacturers which were to be sold to Retailers. For each transaction, Petters and his co-conspirators provided a series of documents to their investors. The documents included a funding request from PCI or its affiliates, executed note documents reflecting the investment and a guaranteed rate of return,

purported purchase orders from a retailer, and purported bills of sale from manufacturers to the vendors. However, the entire "purchase order financing" business was a multi-billion dollar Ponzi scheme. There were no goods, no real bills of sale, and no real purchase orders. Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they received from investors to make disbursements and other payments to other investors, and to enrich themselves.

The goods and merchandise in which the Funds purportedly held a perfected security interest did not exist. Accordingly, the Notes held by the Funds were virtually worthless.

**Bell's Round Trip Transactions**

From 2001 to September 2008, the Funds raised over a billion dollars by selling interests to hundreds of investors. The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

The bulk of the money was unknowingly funneled into Petters' Ponzi scheme by virtue of the purchase of Notes issued by Thousand Lakes.

In December of 2007, Petters told Bell that Costco was late in paying its outstanding invoices, and an agreement was reached between Petters and Bell to extend the term on the Notes from 180 days to 270 days.

In January of 2008, Petters told Bell that Costco would be very late in paying the outstanding invoices. Petters suggested that Bell exchange collateral with Petters and replace the Costco invoices with "good collateral" in the form of invoices from other Retailers that would be paid in 90 days.

4

Beginning on February 26, 2008, Bell and Petters created a series of "round trip" transactions in which Bell wired money to Petters to invest in new Notes secured by purported "good collateral." Petters then wired the money back to Bell to pay off delinquent Notes secured by "bad collateral." These transactions typically occurred within 24 hours, and the purpose and effect was to conceal from the Funds' investors the fact that Thousand Lakes was delinquent in payments to the Funds and to give investors the false impression that Thousand Lakes was paying off its Notes in a timely manner.

On February 26, 2008, the date upon which Bell and Petters began the "round trip" transactions, the Funds became a Ponzi scheme and continued as such until the Petition Date. During this time, the Funds operated at a loss and were not a legitimate operation. There were no real earnings or profits; the only sources of funding were either the "round trip" transactions or the investments of new investors. While each of the Funds held separate operating accounts, the investors' funds were commingled in each of the operating accounts. The interest and principal payments made to investors were made on account of later investments. Around the time that the Petters Ponzi scheme began to unravel, Bell converted his own Funds into a second level Ponzi scheme in an attempt to keep the Funds afloat for as long as possible.

On December 1, 2008, a Federal Grand Jury in the District of Minnesota indicted Petters in connection with his operation of the Ponzi scheme. On December 2, 2009, Petters was found guilty of all 20 counts charged in the indictment. He was sentenced to 50 years in prison for his crimes.

On September 23, 2009, Bell plead guilty to a single count of wire fraud. On September 30, 2010, he was sentenced to 72 months in prison for his fraudulent activity.

Ritchie, the Defendant herein, is an investment fund that owned equity shares of Lancelot Ltd. Ritchie redeemed certain of its shares in Lancelot Ltd., and tendered its shares in connection with that redemption. Ritchie received cash Transfers from Lancelot Ltd. in exchange for those redeemed shares on January 22, 2007 and April 13, 2007. The redemption of Lancelot Ltd. shares was governed by the Lancelot Investors Fund, Ltd. Confidential Information Memorandum, dated March 2006 ("Lancelot CIM"). The Defendant's contractual right to redemption is limited under the Lancelot CIM to the Defendant's portion of Lancelot Ltd.'s net asset value ("NAV"). Both the NAV and the calculation of Share NAV were determined by the Administrator based upon information provided by the Investment Manager, as defined in the Lancelot CIM.

Pursuant to the Lancelot CIM, the NAV of the Fund "equals the total assets of the fund, less its total liabilities (including accrued liabilities, irrespective of whether such liabilities may in fact ever be paid), determined in accordance with GAAP [generally accepted accounting principles]."

The Trustee filed the Amended Complaint on July 14, 2011. In Counts I and II of the Complaint, the Trustee seeks the avoidance and recovery of Constructive Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550 of the Bankruptcy Code; 740 ILCS 160/5(a)(2), 160/6(a), 160/8(a) (constructive fraud claim under Illinois law); and 11 U.S.C §§ 544(b)(1). In Count III of the Complaint, the Trustee seeks the disallowance of claims pursuant to 11 U.S.C § 502(d).

### III.  STANDARDS

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12 made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012.  To satisfy the pleading requirements of Federal Rule of Civil Procedure 8, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7008, the complaint must contain "a short and plain statement showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a).[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (*quoting Bell Atl.*, 550 U.S. at 556). Dismissal is appropriate only if it is clear in the pleadings that no set of facts could be proven in support of the plaintiff's claims that would entitle him to the relief requested. *Panarus v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 791 (7th Cir. 1996).

---

[1] Defendant brings this motion pursuant to Rule 8 pleading requirements. The Court notes, however, that when a claim is based on fraud the heightened pleading standards of Rule 9(b) apply.  Pursuant to Rule 9(b) standards, the plaintiff must state with particularity the circumstances surrounding the fraud. Fed.R.Civ.P. 9(b). "Particularity" means the who, what, when, where and how; the first paragraph of any newspaper story. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). A complaint asserting a constructive fraud claim must allege what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances. *In re Life Fund 5.1 LLC, et al*, No. 09 B 32672, Adv. No. 10 A 42, 2010 WL 2650024, at * 3 (Bankr. N.D.Ill. June 30, 2010).

7

When considering a motion to dismiss, courts are precluded from considering documents outside the pleadings. Fed. R. Civ. P. 12(d). However, where a document is referenced in a plaintiff's complaint, and is central to the plaintiff's claims, it may be considered in deciding a motion to dismiss. *See Hecker v. Deere & Co.*, 556 F.3d 577, 582 (7th Cir. 2009). Here, the Lancelot CIM was referred to in the Complaint and is central to the claims at issue. The Trustee alleges that the Defendants' contractual right to redemption is limited to the terms of the Lancelot CIM but argues that the Defendants did not receive the redemption payments in accordance with its terms. Accordingly, the Court may consider the Lancelot CIM with this Motion to Dismiss.

## IV.    DISCUSSION

The Defendant argues that dismissal of the constructive fraudulent transfer claims is warranted because the Trustee cannot establish that Lancelot Ltd. received less than reasonably equivalent value in exchange for the redemption payments made to Ritchie. Specifically, the Defendant posits that the facts as pleaded demonstrate that Lancelot Ltd. received reasonably equivalent value for the Transfers at issue because they satisfied, dollar-for dollar, the contractual debt obligation Lancelot Ltd. owed to Ritchie for the shares it redeemed. The only issue before the Court is whether the Trustee has sufficiently alleged that Lancelot Ltd. did not receive reasonably equivalent value.

### a. Reasonably Equivalent Value

To prevail on a constructive fraudulent transfer claim under each statute, the plaintiff must prove that the debtor received less than reasonably equivalent value

8

in exchange for the transfer or obligation.[2] The measurement of reasonably equivalent value is a question of fact. *In re First Commercial Mgmt. Group*, 279 B.R. 230, 235 (Bankr. N.D. Ill. 2000). There is no fixed formula for determining reasonably equivalent value. *Barber v. Golden See Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997). Rather, courts are required to consider the facts of each case. *Barber*, 129 F.3d at 387. When making such a determination, courts must isolate the transactions between the debtors and the defendants so that the value exchanged can be analyzed based on the contractual relationship between the parties and the quid pro quo thereunder. *In re Churchill Mortgage Inv. Corp.*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000);

### i. The Trustee has Sufficiently Alleged Lack of Reasonably Equivalent Value pursuant to Section 548

At the center of this dispute is the calculation of the NAV which determined the sum certain that Lancelot Ltd. was to pay Ritchie upon redemption of Lancelot Ltd.'s shares. In the Complaint, the Trustee alleges that the Defendant did not receive its redemption payment in accordance with the terms of the Lancelot CIM. The Determination of NAV set forth in the Lancelot CIM provides as follows:

> The "Net Asset Value of the Fund" and the calculation of Share NAV is determined by or at the direction of the Administrator as of the end of each fiscal month and on such other dates as the Administrator shall determine, in U.S. Dollars based upon information provided by the Investment Manager.

---

[2] To prevail on a constructive fraudulent transfer claim, the Trustee must establish that (1) an interest of the Debtors in property was transferred; (2) the transfer of that interest occurred within the applicable statutory period; (3) the debtor did not receive reasonably equivalent value in exchange for the transfer at issue; and (4) the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer. 11 U.S.C. § 548(a)(1)(B); *In re Eckert*, 388 B.R. 813, 856 (Bankr. N.D. Ill. 2008).

> The "Net Asset Value of the Fund" as of any calculation date equals the total assets of the Fund, less its total liabilities (including accrued liabilities, irrespective of whether such liabilities may in fact ever be paid), determined in accordance with GAAP except as described herein. The Share NAV as of any calculation date will be calculated by dividing the Net Asset Value of the Fund by the number of issued Shares as of the close of business on such calculation date.
>
> Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's Net Asset Value if the Investment Manager's judgments regarding appropriate valuations should prove incorrect. In the absence of bad faith or manifest error, the Administrator's Net Asset Value determinations are conclusive and binding on all Shareholders.

*See* Lancelot Ltd. CIM, Adv. No. 10-02039, Dkt No. 39, Ex. A, pp. 24-25.

The Defendant argues that the NAV was calculated pursuant to the terms of the Lancelot CIM and notes that the Trustee offers no basis for use of a different valuation. The Defendant also relies on the Trustee's failure to plead any allegations of bad faith on the part of the Administrator, which determined the Share NAV, or on the part of the Investment Manager, which supplied the information used in the calculation of NAV. The Defendant concludes that those factors establish that Lancelot Ltd. received reasonably equivalent value for the redemption payments because they satisfied dollar for dollar, a contractual debt owed to Ritchie.

The Defendant's argument ignores well established caselaw which instructs courts to look at all the facts of the case in determining reasonably equivalent value. *Barber,* 129 F.3d at 387. Further, because reasonably equivalent value is a factual inquiry, it is an inappropriate issue to resolve at the motion to dismiss stage. *Madoff Inv. Sec. LLC. v. Madoff et al (In re Madoff)*, 458 B.R. 87, 113 (Bankr.

S.D.N.Y. 2011). In any event, the Defendant has not convinced this Court that no set of facts would entitle the Trustee to the relief sought.

The Trustee alleges in the Complaint, that any "value" received by the Debtors from the Transfers to the Defendant was limited to its portion of Lancelot Ltd.'s NAV and Share NAV. He also alleges that the determination of these amounts was incorrectly and grossly miscalculated because they were based upon the incorrect assumption that the Petters Notes were legitimate. (Complaint, ¶ 63).

In further support of this theory, the Trustee specifically alleges that the bulk of the assets of the Debtors consisted of Notes from the Petters Ponzi scheme and were virtually worthless (Complaint, ¶ 15), and that because the Funds' liabilities exceeded their assets, Defendants did not receive the payments in accordance with the terms of the Lancelot CIM. The Trustee also alleges that over the life of Defendant's investment, its principal investment in Lancelot Ltd. was $32,363,409.71, and Lancelot Ltd. transferred to Defendant or on account of the Defendant $47,746,608.44. The Trustee maintains that the difference of $15,383,198.73 (the Redemption Amount) is a fictitious profit. (Complaint, ¶ 53). The Court is satisfied that the Trustee's allegations respecting reasonably equivalent value go well beyond "mere formulaic recitations of statutory elements." Accordingly, these allegations, viewed together, present a sufficiently plausible claim that the transfer lacked reasonably equivalent value. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). ("The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."). (internal citation omitted).

The Motion to Dismiss Count I is DENIED.

11

      ii.    **The Trustee has Sufficiently Alleged Lack of Reasonably Equivalent Value pursuant to the Illinois UFTA**

Count II asserts a claim for the Avoidance and Recovery of Constructive Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(2), 160/6(a), 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code. The Court likewise finds that the Trustee has sufficiently stated a plausible claim for the avoidance and recovery of constructive fraudulent transfers under the Illinois UFTA. The analysis of reasonably equivalent value is the same under both section 548 and the UFTA, therefore, the Court finds that the Trustee has sufficiently plead a claim for constructive fraudulent transfer. *See In re Eckert*, 388 B.R. at 856 (noting that the requirements of 11 U.S.C. § 548 and the UFTA are analogous.). The Motion to Dismiss Count II is DENIED.

### b. Disallowance of Claims

In Count III, the Trustee seeks the disallowance of claims pursuant to 11 U.S.C. § 502(d). Section 502(d) of the Code "requires that the court disallow 'any claim' of any entity from which property is recoverable by a trustee, or that is the transferee of an avoidable transfer, unless and until the property is turned over and the transfer is paid." *In re Sierra-Cal*, 210 B.R. 168, 170 (Bankr. E.D.Cal. 1997). Because the Court has determined that the Trustee has sufficiently plead a claim for Constructive Fraudulent Transfer in Counts I and II of the Complaint, the Motion to Dismiss Count III is DENIED.

## V. CONCLUSION

For the reasons noted herein, the Motion to Dismiss Counts I – III is DENIED. A separate Order will issue.

The Court notes that it may enter its Order Denying the Motion to Dismiss Counts I, II and III because it does not qualify as a final appealable order. *U.S. v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 668 (6th Cir. 2000).

Dated: March 2, 2012                    ENTERED:     *Jacqueline P. Cox*

                                        ___*J. Cox*_____
                                        Jacqueline P. Cox
                                        United States Bankruptcy Judge

13